**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

HDC Medical, Inc.,

        Plaintiff,

                            **MEMORANDUM OPINION**
      v.                      **AND ORDER**
                            Civil No. 04-143 ADM/AJB

Minntech Corporation,

        Defendant.

_____

Stuart E. Alexander III, Esq., Tilford, Dobbins, Alexander, Buckaway & Black, Louisville, KY, and Kevin M. Magnuson, Briggs & Morgan, P.A., Minneapolis, MN, argued for and on behalf of Plaintiff.

Todd Wind, Esq., Laurie Miller, Esq., and Nathan Hartshorn, Esq., Fredrikson & Byron, P.A., Minneapolis, MN, argued for and on behalf of Defendant.

_____

## I. INTRODUCTION

On November 9, 2005, oral argument before the undersigned United States District Judge was heard on Defendant Minntech Corporation's ("Defendant" or "Minntech") Motion for Summary Judgment [Docket No. 28]. In its Complaint [Docket No. 1], Plaintiff HDC Medical, Inc. ("Plaintiff" or "HDC") alleges Minntech violated sections of the Sherman Antitrust Act. Minntech's Motion is granted.

## II. BACKGROUND

HDC is a Kentucky corporation founded by former Minntech employee Hugh Doss ("Doss"). Doss Dep. (Hartshorn Aff. [Docket No. 32] Ex. A) at 6-7, 10-12. The products involved in the instant case are used in kidney dialysis. These products include dialyzers, filtration devices used to remove waste and water from blood during dialysis procedures. There are two types of dialyzers–disposable, or single-use dialyzers, and reusable, or multiple-use

dialyzers.  Single-use dialyzers, as the name implies, are used only once and then disposed.

Multiple-use dialyzers can be reused.  Between uses, stringent methods of cleaning and

disinfecting the multiple-use dialyzers must be performed.  Additionally, each cleaning of a

dialyzer must be recorded and reported.  Standard practice for dialysis clinics using multiple-use

dialyzers includes strict labeling and record keeping of dialyzer use and reprocessing.  Maness

Report (Magnuson Aff. [Docket No. 40] Ex. 1) ¶ 17.

Two other factors significantly differentiate single- and multiple-use dialyzers.  First,

single-use dialyzers are more expensive than multiple-use dialyzers.  Second, while multiple-use

dialyzers are subject to regulations regarding record keeping, single-use dialyzers, which are

discarded after use, are not subject to the same stringent record keeping regulations.  As of 2002,

80% of dialysis clinics were using multiple-use dialyzers.  Magnuson Aff. Ex. 17.  The cost of a

single-use dialyzer varies between $7.50 and $8.00, while the cost of one treatment with a

multiple-use dialyzer is $5.00 to $6.00.  Grady Dep. (Hartshorn Aff. Ex. C) at 81-82; Doss Dep.

at 40.

Minntech manufactures reprocessing equipment and products intended for multiple-use

dialyzers.  Malkin Dep. (Hartshorn Aff. Ex. B) at 12-14.  Specifically, Minntech manufactures

the Renatron, a device used in reprocessing dialyzers.  Grady Dep. at 21-22.  A multiple-use

dialyzer is attached to the Renatron after use.  Id. at 21-22, 30-32.  The dialyzer is then cleaned

by a germicide.  Id.  Minntech manufactures a liquid germicide called Renalin, a paracetic acid-

based solution cleared by the Food and Drug Administration ("FDA") as a sterilant.  Id. at 43.

Renalin and the Renatron have received FDA 510(k) clearance for sale as a system.  Id. at 54-61.

HDC manufactures a dialyzer reprocessing device called the MAKY.  Doss Dep. at 21, 48-58, 73.   HDC also produces a germicide known commercially as Peracidin.  Id. at 21, 48-58, 73.  Peracidin was introduced to the market in 1998, a few years after the expiration of Minntech's patent on Renalin.  A case of Peracidin costs $130.00, while a case of Renalin is priced at $200.00.  Id. at 83; Grady Dep. at 110.

The final piece of equipment at issue is software designed to gather data and maintain records for purposes of meeting federal regulations and Association for the Advancement of Medical Instrumentation guidelines.  Grady Dep. at 98-106.  This software, produced by Minntech, is called Renalog RM.  The MAKY contains a built-in computer program that performs functions similar to that of Renalog RM.  Doss Dep. at 21, 48-58, 73.  Minntech also produces Renalog III, still another software program that performs record keeping functions. Grady Dep. at 106-07.

Following the introduction of HDC's Peracidin to the market in 1998, it achieved an 11% share of the reprocessing agent market by the year 2000.  After 2000, Minntech undertook actions which increased its share of the reprocessing agent market while simultaneously reducing HDC's share.  It is these actions that are the main focus of HDC's monopolization claims.  HDC alleges that Minntech: (1) installed a barcode scanner on Renatrons beginning in 2002 that prevented the automated use of the Renatron unless the reprocessing agent used was Renalin; (2) voided warranty protections on Renatrons if reprocessing agents other than Renalin were used; (3) provided only Renalin users with free technical services, a discount on repair parts, and preventative maintenance packages; (4) conducted a campaign of product disparagement against Peracidin; and (5) tied the sale of the Renatron to Renalin.  HDC now brings this lawsuit,

claiming monopolization, attempted monopolization, and illegal tying of products.

### III. DISCUSSION

**A.     Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Tying Claim**

In its Complaint, HDC asserts that "[t]he requirement imposed by the incorporation of the Renalog RM Software that Renatron operators use only Renalin is a tying arrangement, in violation of Sherman Act, 15 U.S.C. §2."  Compl. ¶ 14.  HDC alleges Renatron customers cannot use Peracidin because Renalog RM software is not compatible with Peracidin.  Id. ¶ 12.  HDC also claims that Renalin and Renatrons are tied through Minntech's pricing and warranty policies.

Under the Sherman Act, product tying can be found in two distinct contexts.  First, "A

tying arrangement is a *per se* violation of Section 1 of the Sherman Act and no particular

showing of unreasonable anti-competitive effect is required if the plaintiff demonstrates that (1)

'two distinct products' or services are involved, (2) the defendant's power in the tying product's

market is capable of restraining competition 'in the tied product's market,' and (3) 'the amount of

interstate commerce in the tied product's market [is] not insubstantial.'" Amerinet, Inc. v. Xerox

Corp., 972 F.2d 1483, 1498-99 (8th Cir. 1992) (quoting Rosebrough Monument Co. v. Mem'l

Park Cemetery Assoc., 666 F.2d 1130, 1140-41 (8th Cir. 1981)).  Second, "[i]n cases where

there is no explicit agreement which conditions the purchase of the tying product upon the

purchase of the tied product, an illegal arrangement may still be shown if the defendant's policy

makes the purchasing of the tying and tied products together the only viable economic option."

Id. at 1500.  "'A tying arrangement is defined as the sale or lease of one item (the tying product)

on the condition that the buyer or lessee purchase a second item (the tied product) from the same

source.'"  Id. at 1498 (quoting Rosebrough, 666 F.2d at 1140).

### 1.     *Per Se* Violation

There is no *per se* violation of the Sherman Act here.  The purchase of any of Minntech's

products at issue, including the Renatron, Renalin, or Renalog RM, are not literally conditioned

on the purchase of any other product.  Grady Dep. at 23-26.  Case law strongly supports

Minntech's position.

HDC contends Renatron customers can not use Peracidin because Renalog RM software

is not compatible with Peracidin.  However, contrary to HDC's allegations, the use of Renalog

RM is not required to use the Renatron.  Id.  A number of options exist for a customer who

wishes to use Peracidin with the Renatron, including the use of Renalog III software.  Id. at 106-

07.  Additionally, Minntech has offered to provide the source code for Renalog RM to its

customers so they may modify it for use with other products.  Malkin Dep. at 64-68.  Indeed,

Doss himself reconfigured Renalog RM to accept Peracidin.  Doss Dep. at 75-76, 166-67.  Even

without these other options, Minntech's offering of a set of technologically compatible products

to its customers that provide additional benefits insulates Minntech from a tying claim.  Courts

have ruled that integrated products that rely on technological advancement should not be stifled

by use of antitrust laws.  The Ninth Circuit expounded on this point in Foremost Pro Color, Inc.

v. Eastman Kodak Co.:

> Quite obviously, a firm that pioneers new technology will often introduce the first of a
> new product type along with related, ancillary products that can only be utilized
> effectively with the newly developed technology. Until other, less technologically
> advanced competitors procure licenses or otherwise develop ancillary products that are
> compatible with the new product, the technological leader will be faced with no present
> competition in the newly developed product market. The essence of a *per se* unlawful
> tying arrangement, however, is that it *forecloses* competition in the market for the tied
> product or products. The creation of technological incompatibilities, without more, does
> not foreclose competition; rather, it increases competition by providing consumers with a
> choice among differing technologies, advanced and standard, and by providing
> competing manufacturers the incentive to enter the new product market by developing
> similar products of advanced technology. Any short-run absence of competition in the
> market for the technologically tied product could just as likely be due to the
> unwillingness or inability of competitors to devote sufficient economic resources to
> match the pace of technological development set by the industry's leader, as to the abuse
> of market power by that dominant firm. Thus, the *per se* rule does not logically fit and
> should not be applied. It is clear that a mere technological tie does not present the
> competitive evils which the *per se* prohibition of tying arrangements is designed to
> prevent.
>
> As a general rule, therefore, we hold that the development and introduction of a system of
> technologically interrelated products is not sufficient alone to establish a *per se* unlawful
> tying arrangement even if the new products are incompatible with the products then
> offered by the competition and effective use of any one of the new products necessitates
> purchase of some or all of the others.  Any other conclusion would unjustifiably deter the
> development and introduction of those new technologies so essential to the continued
> progress of our economy.

703 F.2d 534, 542 (9th Cir. 1983) (emphasis in original).

Here, Minntech introduced Renalog RM to simplify the complex task of recording and reporting data on multiple-use dialyzers. Although the combined use of the Renatron, Renalin, and Renalog RM may very well be more attractive to customers than using other software or modifying Renalog RM, Minntech has not foreclosed competition on Peracidin. Foreclosing competition is the essence of a *per se* tying allegation. Doss has agreed that customers obtain a benefit from purchasing the integrated group of products because of the ease of the reuse process. Doss Dep. at 55-57. Therefore, Minntech possessed legitimate reasons for marketing its set of products, rebutting HDC's claim that the only purpose for the products was to foreclose the market to competitors. On this point, the logic employed by the Ninth Circuit in Foremost is convincing: "We do not believe that, standing alone, such technological interrelationship among complementary products is sufficient to establish the coercion essential to a per se unlawful tying arrangement. Indeed, such a rule could become a roadblock to the competition vital for an ever expanding and improving economy." 703 F.2d at 542.

HDC next avers that Minntech's warranty policy on the Renatron, which requires the use of Renalin to maintain its validity, is unlawful. However, the Eighth Circuit has held that as long as the receipt of service on a product is not conditioned upon compliance with warranty requirements, a warranty may be legally tied to use of a certain product. In Marts v. Xerox, Inc., a claim was made that Xerox had illegally tied a warranty to its copiers. The validity of the warranty was conditioned on the continued use of Xerox cartridges in its copiers. The Eighth Circuit held:

> We need not decide these issues here, however, since we conclude that Lasertech has in any event not presented sufficient evidence of an illegal tying arrangement to create a

genuine issue for trial. Although the warranty does condition its continuation on the use of Xerox cartridges, a warranty is only one way of receiving service for a new Xerox copier. "[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price."

Marts v. Xerox, Inc., 77 F.3d 1109, 1112 (8th Cir. 1996).

In the instant case, although use of Peracidin would void the one year warranty on the Renatron, Minntech has not foreclosed the market. No allegation has been made that Peracidin users can not receive service on Renatrons from Minntech. Moreover, the warranty at issue is merely a one year warranty on a product intended to operate for a longer time period, further devaluing the warranty. Neary Dep. (Hartshorn Aff. Ex. E) at 15-16. Finally, Minntech argues that it can not reasonably warrant that Renatrons will operate with every conceivable cleansing product a customer might use.[1] For these reasons, no *per se* tying scheme can be shown between the Renatron and a warranty requiring the use of Renalin.

## 2.    Only Viable Economic Option

Because HDC has failed to present facts demonstrating a *per se* tying violation, it must demonstrate that Renatron customers can not use Peracidin because Renalog RM is incompatible with Peracidin, and second, that such a policy makes the purchase of Minntech products the only viable economic option. HDC fails to present facts demonstrating that this is so.

Although HDC alleges that automated Renatrons are unavailable unless one uses Renalin, the undisputed facts demonstrate otherwise. First, a customer wishing to use Peracidin with the Renatron may purchase software other than Renalog RM to automate the Renatron.

---

[1] The parties dispute whether Renalin and Peracidin are identical or merely similar. This dispute is immaterial, however. HDC can not cite to any authority stating that warranties must apply not only to the company's products, but also to any product found to be identical to it.

Minntech's Renalog III software and HDC's software products, for example, both allow use of

Peracidin with the Renatron.  Grady Dep. at 106-07.  Additionally, Doss testified that HDC

developed bar codes that permit Renalog RM to work with Peracidin.  Doss Dep. at 75-76, 166-

67.  Finally, Minntech informed customers that it was willing to disclose the source code of

Renalog RM so that customers might customize their software to be compatible with other

products.  Malkin Dep. at 64-68.  HDC has proffered no facts to rebut those offered by

Minntech; nor is it able to demonstrate that these alternatives are economically unviable.  Thus,

HDC's tying claim must fail.

HDC also fails to present facts suggesting that the voiding of the Renatron warranty

makes use of Peracidin economically unfeasible.  To make such a determination, HDC would

have to proffer evidence demonstrating that repairing Renatrons without a warranty is

prohibitively expensive.  Again, the Renatron's warranty is only a one year warranty, and

Renatrons are intended to be used for considerably longer.  Neary Dep. at 15-16.  As the Eighth

Circuit held in Marts:

> Lasertech has failed to introduce evidence that purchasing service from Xerox through
> the service maintenance agreement or on a time and materials basis is not viable. The
> record contains no information regarding the frequency of required repairs on Xerox
> copiers. Without that data, it is impossible to know whether the other service and
> cartridge options are materially more expensive, and if so by how much. Because we
> cannot conclude that the other service options were prohibitively expensive . . . any tying
> arrangement was not illegal and summary judgment was appropriate as to the initial
> warranty.

77 F.3d at 1113.  Similarly, HDC has failed to present evidence demonstrating that owning a

Renatron without a warranty is excessively costly in comparison to a viable warranty.  As a

result, HDC's tying claim on the Renatron warranty must fail.

HDC also alleges that Minntech's policy of providing Renalin users with free technical

services and a repair discount constitute antitrust violations.  Again, however, no evidence has been adduced to demonstrate that these benefits to Minntech's customers make use of Peracidin or other non-Minntech products economically unfeasible.  The only evidence on the record is George Kosicki's conclusion that the benefits afforded to Renalin customers are not sufficient to make use of Peracidin with the Renatron economically unfeasible.  Kosicki Report (Magnuson Aff. Ex. 2) ¶¶ 38-50.  Without any evidence to rebut this testimony, HDC's claim can not survive Minntech's Motion.

### 3.    Market Power

Even assuming that HDC was able to demonstrate an unlawful tie between Minntech's products, it must demonstrate that Minntech maintained sufficient power in the market to restrain competition in the tied product market.  Amerinet, 972 F.2d at 1498-99.  Here, the parties disagree as to the scope of the market at issue.  It is well-established that the relevant market is defined as the "reasonable interchangeability of use or the cross-elasticity of demand."  Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).  "In plain language, this means that the court should [define] the relevant market to include all services which, in light of geographical availability, price and use characteristics are in realistic rivalry for all or some part of the business. [I]f defendant has so large a fraction of the market as to constitute a 'predominant' share, a rebuttable presumption of monopolization follows.  The fraction depends upon the denominator (the 'market') as well as the numerator (the defendants' volume).  Clearly, this 'presumption' is unwarranted unless the 'market' is defined to include all competitors."  SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063 (3d Cir. 1978).

Here, the geographic area of the market, which is the entire country, is not disputed.  The

parties do, however, disagree as to whether the relevant market for dialyzers includes both

single-use and multiple-use dialyzers, or whether the two products constitute two markets.  HDC

argues that the price difference between single- and multiple-use dialyzers suggests that two

distinct markets exist.  Although the parties offered varying testimony on the cost differential

between single- and multiple-use dialyzers, the difference is not particularly significant.  It is

undisputed that the cost of a single-use dialyzer is between $7.50 and $8.00, while the cost of

one treatment with a multiple-use dialyzer is $5.00 to $6.00.  Grady Dep. at 81-82; Doss Dep. at

40.  Thus, the difference in price falls between $1.50 and $3.00 per treatment.  HDC argues that

the testimony supports the cost of a single-use dialyzer is potentially 30% higher than one

multiple-use dialyzer treatment, and, as a result, is in a different market because of the price

difference.  HDC cites cases in which a price difference between products that otherwise perform

the same functions resulted in a finding that the multiple markets existed.  United States v.

Aluminum Co. of Am., 377 U.S. 271, 273 (1964); United States v. Archer-Daniels-Midland Co.,

866 F.2d 242, 246 (8th Cir. 1988).  If the relevant market is defined as only multiple-use

dialyzers, Renalin sales constitute between 74% and 95% of reprocessing agent sales, which,

HDC argues, constitutes a dangerous probability of monopolization.  Maness Report ¶¶ 56-58;

Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc., 845 F.2d 404, 409 (2d Cir.

1988).

HDC's argument fails, because, although it considers price characteristics, it fails to

consider use characteristics.  HDC's analysis fails to factor into the analysis that single-use

dialyzers offer significant advantages to multiple-use dialyzers.  Specifically, single-use

dialyzers eliminate the need for dialysis clinics to sterilize the dialyzers, and are further exempt

from the stringent recording and reporting requirements involved with multiple-use dialyzers.

Additionally, the undisputed facts demonstrate that in recent years, the price for single-use

dialyzers has fallen dramatically, from approximately $30.00 per dialyzer to under $10.00 per

dialyzer. Grady Dep. at 73, 83-84. Because of the precipitous price drop and the ease of use,

several companies, including Gambro Health Care and DeVita, Inc., have switched from

multiple-use dialyzers to single-use dialyzers. Malkin Dep. at 12-13, 15-16, 20; Grady Dep. at

71-72, 78. Doss admitted that single-use dialyzers are a competitive threat to HDC, and that

HDC has lost business to single-use dialyzers. Doss Dep. at 39-40, 167. Therefore, given the

price and use characteristics of single- and multiple-use dialyzers, the only reasonable

conclusion regarding the relevant market is that both types of dialyzers constitute the relevant

market.

Even if both single- and multiple-use dialyzers are considered in the relevant market,

HDC argues Minntech still has a dangerously large share of the redefined market. The only

evidence of Minntech's share of this was a year 2000 figure setting the market share at 64%.

Kosicki Dep. (Magnuson Aff. Ex. 5) at 116. However, it is undisputed that the market has

changed drastically since 2000. Although HDC alleges it was in 2000 that Minntech began its

allegedly predatory practices, evidence was also adduced that the price of single-use dialyzers

has dropped significantly since 2000, thereby adjusting the market. Therefore, HDC has failed

to present evidence of market control by Minntech sufficient to survive summary judgment.

### 4. Clayton Act Claim

In addition to its Sherman Act tying claim, HDC contends Minntech violated Section 3 of

the Clayton Act by tying the sale of its products to an agreement not to use the goods of a

competitor.  Specifically, HDC argues the tying of the Renatron warranty to the use of Renalin

constitutes an agreement not to use the goods of a competitor of Minntech.  Compl. ¶ 11.  The

Clayton Act states, in part: "It shall be unlawful for any person engaged in commerce, in the

course of such commerce, to lease or make a sale or contract for sale of goods . . . or fix a price

charged therefor . . . on the condition, agreement, or understanding that the lessee or purchaser

thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller

. . . ." 15 U.S.C. § 14.

> Again, the Eighth Circuit spoke clearly on this issue in Marts:
>
> Regardless of how the tying product market is defined, Lasertech also cannot prevail
> under the Clayton Act. If the tying product market is service on new Xerox copiers, the
> Clayton Act is inapplicable because warranties are services. The Clayton Act applies
> only when both the tying and tied products are goods.

77 F.3d at 1113 n.6 (citing 15 U.S.C. § 14).  Here, there is no allegation that the Renatron

warranty is a good.  Thus, because the warranty at issue is a service, not a good, HDC's Clayton

Act claim fails.

**C.      Monopolization and Attempted Monopolization Claims**

In addition to its tying claims, HDC argues that Minntech has either monopolized, or has

attempted to monopolize, the multiple-use dialyzer reprocessing agent market.  "In order to

succeed on a monopolization claim under Section 2 of the Sherman Act, [plaintiff] must prove

that [defendant] (1) possessed monopoly power in the relevant market and (2) willfully acquired

or maintained that power as opposed to gaining that power as a result 'of a superior product,

business acumen, or historical accident.'" Amerinet, 972 F.2d at 1490 (quoting United States v.

Grinnell Corp., 384 U.S. 563, 570-71 (1966)).  "In order to maintain an attempted

monopolization claim under Section 2, [plaintiff] must prove: '(1) a specific intent by the

defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success.'" Id. at 1490 (quoting Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 801 (8th Cir. 1987)).  Both claims, therefore, requiring a showing that Minntech either possessed monopoly power in the market, or had a dangerous probability of success in monopolizing the market.

HDC can not maintain either argument.  As noted above, the relevant product market encompasses both single- and multiple-use dialyzers.  Furthermore, undisputed evidence demonstrates that single-use dialyzers are dynamically transforming the market for dialyzers.  As a result, any short-term gains realized by Minntech by introducing its technologically compatible set of products are not sufficient to monopolize, or threaten to monopolize, the relevant market. Thus, for the reasons previously expressed, Minntech does not control the relevant market for dialyzers and their accompanying products.  Thus, HDC's monopolization and attempted monopolization arguments fail.

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Minntech Corporation's Motion for Summary Judgment [Docket No. 28] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  January 27, 2006.